[No. 200-1. Division One—Panel 1. November 30, 1970.]

THE STATE OF WASHINGTON, *Respondent*, v. JESSE ALLEN
Cox, *Appellant*.

*Koenigsberg, Brown & Sinsheimer* and *Ronald J.
Meltzer,* for appellant.

*Charles O. Carroll, Prosecuting Attorney,* and *James
Warme,* for respondent.

JAMES, C. J.—Jesse Cox was a clerk in a Seattle maga-
zine, book, and film store. He was charged with violating

RCW 9.68.010,[1] a gross misdemeanor. The gravamen of the charge is that he possessed obscene materials with the intention of selling them. After a trial without jury, he was found guilty of each of 12 counts. Each count concerned a different magazine or motion picture film. He was sentenced to serve a term of 30 days on each count, with the sentences to run consecutively. The trial judge deferred execution of the sentences for a period of 1 year on the condition that Cox pay a fine of $1,000 and costs within 1 year and that he "continue to disassociate himself with this type of activity." The trial judge further ordered that the period of probation would run indefinitely until revoked, modified, changed, or terminated by an order of the court.

Motion pictures and "girlie" magazines of the type involved in this case are within the ambit of the guarantees of freedom of speech and of the press afforded by the unconditional language of the first amendment to the United States Constitution. *Jacobellis v. Ohio,* 378 U.S. 184, 12 L. Ed. 2d 793, 84 S. Ct. 1676 (1964); *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 96 L. Ed. 1098, 72 S. Ct. 777 (1952). But, if "obscene" they forfeit their constitutional protection.

[1]"Every person who—

"(1) Having knowledge of the contents thereof shall exhibit, sell, distribute, display for sale or distribution, or having knowledge of the contents thereof shall have in his possession with the intent to sell or distribute any book, magazine, pamphlet, comic book, newspaper, writing, photograph, motion picture film, phonograph record, tape or wire recording, picture, drawing, figure, image, or any object or thing which is obscene; or

"(2) Having knowledge of the contents thereof shall cause to be performed or exhibited, or shall engage in the performance or exhibition of any show, act, play, dance or motion picture which is obscene;

"Shall be guilty of a gross misdemeanor.

"The provisions of this section shall not apply to acts done in the scope of his employment by a motion picture operator or projectionist employed by the owner or manager of a theatre or other place for the showing of motion pictures, unless the motion picture operator or projectionist has a financial interest in such theatre or place wherein he is so employed or unless he caused to be performed or exhibited such performance or motion picture without the knowledge and consent of the manager or owner of the theatre or other place of showing."

But implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance. This rejection for that reason is mirrored in the universal judgment that obscenity should be restrained, reflected in the international agreement of over 50 nations, in the obscenity laws of all of the 48 States, and in the 20 obscenity laws enacted by the Congress from 1842 to 1956. This is the same judgment expressed by this Court in *Chaplinsky v. New Hampshire,* 315 U. S. 568, 571-572:

> ". . . There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. *These include the lewd and obscene . . . . It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. . . .*" (Emphasis added.)

We hold that obscenity is not within the area of constitutionally protected speech or press.

(Footnotes omitted.) *Roth v. United States,* 354 U.S. 476, 484, 1 L. Ed. 2d 1498, 77 S. Ct. 1304 (1957).

Because freedom of speech and of the press is indispensable to the preservation of a free society, and because the denial of constitutional protection to "obscenity" does, even though slightly, open the door so that other eroding exceptions might eventually intrude, *Roth v. United States, supra,* it has been recognized that in this esoteric field of law an appellate court cannot place its usual reliance upon the fact finding by a trial judge or jury. *Jacobellis v. Ohio, supra.*[2] We must therefore independently examine Cox's

---

[2]*See* Lockhart & McClure, *Censorship of Obscenity: The Developing Constitutional Standards,* 45 Minn. L. Rev. 5, 116, 119 (1960):

This obligation—to reach an independent judgment in applying constitutional standards and criteria to constitutional issues that may be cast by lower courts "in the form of determinations of fact" —appears fully applicable to findings of obscenity by juries, trial courts, and administrative agencies. The Supreme Court is subject to that obligation, as is every court before which the constitutional issue is raised.

. . .

magazines and films and determine whether his possession and sale was constitutionally protected.

The Roth test of obscenity—"whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest" (*Roth v. United States, supra* at 489)—has not made easy the task of maintaining the compromise between society's essential need to guarantee to all the right to speak freely and society's asserted need to prohibit speech which may offend or even harm without offering any redeeming social value whatever.[3]

The Roth test, as augmented in subsequent cases, was restated in *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General*, 383 U.S. 413, 16 L. Ed. 2d 1, 86 S. Ct. 975 (1966), wherein Mr. Justice Brennan said at page 418,

We defined obscenity in *Roth* in the following terms: "[W]hether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." 354 U. S., at 489. Under this definition, as elaborated in subsequent cases, three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value.

. . . It may be true, . . . that judges "possess no special expertise" qualifying them "to supervise the private morals of the Nation" or to decide "what movies are good or bad for local communities." But they do have a far keener understanding of the importance of free expression than do most government administrators or jurors, and they have had considerable experience in making value judgments of the type required by the constitutional standards for obscenity. If freedom is to be preserved, neither government censorship experts nor juries can be left to make the final effective decisions restraining free expression. Their decisions must be subject to effective, independent review, and we know of no group better qualified for that review than the appellate judges of this country under the guidance of the Supreme Court.

[3]*See* Magrath, *The Obscenity Cases: Grapes of Roth,* 1966 Supreme Court Review, 7.

In *Memoirs*, the Supreme Judicial Court of Massachusetts affirmed a trial judge's decision that *Memoirs* was obscene and therefore "not entitled to the protection of the first and fourteenth amendments to the Constitution of the United States against action by the Attorney General or other law enforcement officer" as provided by a Massachusetts statute. The Supreme Court reversed, saying,

> A book cannot be proscribed unless it is found to be *utterly* without redeeming social value. This is so even though the book is found to possess the requisite prurient appeal and to be patently offensive. Each of the three federal constitutional criteria is to be applied independently; the social value of the book can neither be weighed against nor cancelled by its prurient appeal or patent offensiveness. Hence, even on the view of the court below that *Memoirs* possessed only a modicum of social value, its judgment must be reversed as being founded on an erroneous interpretation of a federal constitutional standard.

(Footnotes omitted.) *Memoirs v. Massachusetts, supra* at 419.

Justice Brennan's opinion in *Memoirs* referred to the Supreme Court's decision in *Ginzburg v. United States*, 383 U.S. 463, 16 L. Ed. 2d 31, 86 S. Ct. 942, 969 (1966), decided on the same day as *Memoirs*, and noted that *Ginzburg* added a new test, that of "pandering." Justice Brennan said,

> Evidence that the book was commercially exploited for the sake of prurient appeal, to the exclusion of all other values, might justify the conclusion that the book was utterly without redeeming social importance. It is not that in such a setting the social value test is relaxed so as to dispense with the requirement that a book be *utterly* devoid of social value, but rather that, as we elaborate in *Ginzburg v. United States, post,* pp. 470-473, where the purveyor's sole emphasis is on the sexually provocative aspects of his publications, a court could accept his evaluation at its face value.

*Memoirs v. Massachusetts, supra* at 420.

Mr. Justice Harlan, dissenting in *Jacobellis*, frankly acknowledges his difficulty "in attempting to verbalize gener-

ally the respective constitutional tests, . . ." *Jacobellis v. Ohio, supra* at 204. For, as Justice Harlan observed, "in truth the matter in the last analysis depends on how particular challenged material happens to strike the minds of jurors or judges and ultimately those of a majority of the members of this Court." *Jacobellis v. Ohio, supra* at 204. Mr. Justice Stewart's observation in his concurring opinion was even more candid:

I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it, and the motion picture involved in this case is not that.

*Jacobellis v. Ohio,* 378 U.S. 184, 197, 12 L. Ed. 2d 793, 84 S. Ct. 1676 (1964).

The motion picture in *Jacobellis* is a French film called "Les Amants" ("The Lovers"). Though Mr. Justice Stewart "knows" that it is *not* obscene, it *is* obscene to Judge Radcliff, who wrote for the majority of the Ohio Supreme Court and described the film as

87 minutes of boredom induced by the vapid drivel appearing on the screen and three minutes of complete revulsion during the showing of an act of perverted obscenity. [It is] not hard-core pornography, *i. e.,* filth for filth's sake. It [is] worse. It [is] filth for money's sake.

*State v. Jacobellis,* 173 Ohio St. 22, 28, 179 N.E.2d 777 (1962), *rev'd sub nom. Jacobellis v. Ohio,* 378 U.S. 184 (1964). Jacobellis was convicted of violating an Ohio statute which prohibited the possession and exhibiting of obscene films. Three dissenting justices, Warren, Clark, and Harlan, agreed with the Ohio Supreme Court that "Les Amants" is obscene. But a majority of the court held, for various reasons, that Jacobellis could not be convicted.

Three years after *Jacobellis* the Supreme Court disposed of three appeals in a remarkable per curiam opinion. One of the three, *Redrup v. New York,* 386 U.S. 767, 18 L. Ed.

2d 515, 87 S. Ct. 1414 (1967),[4] is strikingly similar in factual pattern to the case before us. The opinion first notes that

> In none of the cases was there a claim that the statute in question reflected a specific and limited state concern for juveniles. See *Prince v. Massachusetts,* 321 U. S 158; cf. *Butler v. Michigan,* 352 U. S. 380. In none was there any suggestion of an assault upon individual privacy by publication in a manner so obtrusive as to make it impossible for an unwilling individual to avoid exposure to it. Cf. *Breard v. Alexandria,* 341 U. S. 622; *Public Utilities Comm'n v. Pollak,* 343 U. S. 451. And in none was there evidence of the sort of "pandering" which the Court found significant in *Ginzburg v. United States,* 383 U. S. 463.

*Redrup v. New York, supra* at 769. In its opinion the court discusses the varying positions taken by the individual justices in the many cases considered subsequent to *Roth* and concludes that "Whichever of these constitutional views is brought to bear upon the cases before us, it is clear that the judgments cannot stand." *Redrup v. New York, supra* at 771. Specifically, the opinion holds that the distribution of the allegedly obscene publications in each of the cases is protected by the First and Fourteenth Amendments from governmental suppression, whether criminal or civil, in personam or in rem.

*Redrup* is significant in that it reiterates the court's earlier suggestions that the various states consider enacting legislation prohibiting the distribution of obscene material to juveniles. It is also significant in holding that the sale of flagrantly sexual magazines by magazine and bookstores does not constitute an assault upon individual privacy, or pandering, as that term was defined in *Ginzburg v. United States, supra.*

Following the decision in *Redrup,* the Supreme Court has reversed a substantial number of convictions without opinion, merely citing *Redrup* as the controlling authority. Typ-

---

[4]For a discussion of the significance of *Redrup,* see Teeter & Pember, *The Retreat from Obscenity: Redrup v. New York,* 21 Hastings L.J. 175 (1969).

ical of such reversals is the case of *United States v. Claimant of 392 Copies of a Magazine Entitled "Exclusive,"* 373 F.2d 633 (4th Cir. 1967), *rev'd sub nom. Central Magazine Sales, Ltd. v. United States,* 389 U.S. 50 (1967). The opinion described the magazines involved with these words:

> *Exclusive* is a collection of photographs of young women. In most of them, long stockings and garter belts are employed to frame the pubic area and to focus attention upon it. A suggestion of masochism is sought by the use in many of the pictures of chains binding the model's wrists and ankles. Some of the seated models, squarely facing the camera, have their knees and legs widespread in order to reveal the genital area in its entirety. In one of the pictures, all of these things are combined: The model, clad only in a framing black garter belt and black stockings is chained to a chair upon which she is seated, facing the camera, with one knee elevated and both spread wide.
>
> We agree with the District Court that these apparently unretouched pictures of young women, posed as they are, are patently offensive and that the magazine *Exclusive* is obscene.

*United States v. Claimant of 392 Copies of a Magazine Entitled "Exclusive," supra* at 634. This language could be used with but slight alteration to describe the contents of the magazines and films seized from Cox.

The covers of Cox's magazines and the containers of the films accurately disclose the nature of the contents. The magazines and the films were not, however, displayed in the windows of Cox's store so as to be visible to anyone passing by. If one wished to see the magazines and films of the type seized in this case, he had to enter the store. Over the front door of the store in which Cox worked was a sign reading "Positively no one under 21 will be admitted." As in *Redrup,* there is in this case no "suggestion of an assault upon individual privacy by publication in a manner so obtrusive as to make it impossible for an unwilling individual to avoid exposure to it" nor is there "evidence of the sort of

'pandering' which the Court found significant in *Ginzburg* . . ." *Redrup v. New York, supra* at 769.

*Redrup, Exclusive,* and the numerous reversals in cases involving similar facts compel the conclusion that Cox's conviction cannot stand "[w]hichever of these constitutional views is brought to bear . . ." *Redrup v. New York, supra* at 771.

We will not speculate about the juridical future of obscenity other than to observe that a discernible conceptual rationale seems to be emerging. As we read *Redrup,* offensive, worthless, prurient material is not to be civilly suppressed or to be the essential element of a criminal conviction unless the material is clearly "hard-core" pornography or unless the accused possessor has conducted himself in a clearly proscribed manner.[5]

Our reading of *Redrup* is reinforced by the 1969 decision in *Stanley v. Georgia,* 394 U.S. 557, 22 L. Ed. 2d 542, 89 S. Ct. 1243 (1969). The court in *Stanley* rejected the assertion that *Roth* declared *all* obscenity to be beyond the protection of the First Amendment and held that a private individual may possess, read, or observe admittedly obscene material in the privacy of his own home.

> *Roth* and its progeny certainly do mean that the First and Fourteenth Amendments recognize a valid governmental interest in dealing with the problem of obscenity. But the assertion of that interest cannot, in every context, be insulated from all constitutional protections. Neither *Roth* nor any other decision of this Court reaches that far. As the Court said in *Roth* itself, "[c]easeless vigilance is the watchword to prevent . . . erosion [of First Amendment rights] by Congress or by the States. The door barring federal and state intrusion into this area cannot be left ajar; it must be kept tightly closed and opened only the slightest crack necessary to prevent encroachment upon more important interests." 354 U. S., at 488. *Roth* and the cases following it discerned such an "important interest" in the regulation of commercial distribution of obscene material. That holding cannot foreclose an examination of the constitutional

---

[5] *See* Teeter & Pember, *The Retreat from Obscenity: Redrup v. New York,* 21 Hastings L.J. 175 (1969).

implications of a statute forbidding mere private possession of such material.

It is now well established that the Constitution protects the right to receive information and ideas. "This freedom [of speech and press] . . . necessarily protects the right to receive . . . ." *Martin v. City of Struthers,* 319 U. S. 141, 143 (1943); [Citations omitted.] This right to receive information and ideas, regardless of their social worth, see *Winters v. New York,* 333 U.S. 507, 510 (1948), is fundamental to our free society. Moreover, in the context of this case—a prosecution for mere possession of printed or filmed matter in the privacy of a person's own home—that right takes on an added dimension. For also fundamental is the right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy.

*Stanley v. Georgia, supra* at 563.

In *Karalexis v. Byrne,* 306 F. Supp. 1363 (D. Mass. 1969), *appeal docketed,* No. 1149, Sup. Ct., Feb. 4, 1970, a 3-judge district court went a step further by holding that a film assumed to be obscene, "I Am Curious (Yellow)" could be exhibited to the public if the advertising did not amount to "pandering" and was not an assault upon individual privacy, and if the admission policy of the theater was controlled by limiting the audience to consenting adults.

In *United States v. Thirty-Seven (37) Photographs,* 309 F. Supp. 36 (C.D. Cal. 1970), a 3-judge district court held that the rationale of *Stanley* required invalidating on constitutional grounds a statute which imposed an absolute ban upon the importation of obscene books and photographs. The court in *United States v. Thirty-Seven (37) Photographs, supra* at 37 held,

The admission of claimant, that is, to distribute and not to view privately, does not prohibit his attack on invalidity of the statute. Freedman v. Maryland, 380 U.S. 51, 85 S. Ct. 734, 13 L.Ed.2d 649 (1965), grants the claimant standing for it holds that in determining the validity of a statute in relation to the First Amendment, a court must determine what the statute can do. If the statute can violate the freedom of speech and press, then it is invalid.

This it clearly does. It prohibits a person who may constitutionally view pictures of the right to receive them.[6]

Without hesitation, we find Cox's magazines and films to be intended to appeal to a prurient interest in sex. We find them to be patently offensive to contemporary community standards. By dictionary definition and by common understanding, the material is clearly pornographic.

That such material has redeeming social value appears to be the rationale of the Supreme Court's decisions which have reversed convictions for the possession and sale of similar magazines and films. Thus it is not "hard-core" pornography. Cox did not "pander" as did Ginzberg, and his method of selling was not an assault upon individual privacy.

For the reasons stated, we hold that Cox's possession and selling of the seized material was constitutionally protected, and his conviction is reversed.

FARRIS, J. (concurring)—Mr. Cox, a retail clerk in a magazine, book and film store was found guilty on 12 counts of possessing obscene materials with the intention of selling them. He appeals.

■■ The questions raised by this appeal were resolved

---

[6]The ruling in *Thirty-Seven (37) Photographs* was accurately forecast by the authors in Note, *Obscenity from Stanley to Karalexis: A Back Door Approach to First Amendment Protection*, 23 Vand. L. Rev. 369, 386 (1970):

> In spite of existing restrictions on the manner of public distribution, the rationale of *Stanley* and *Karalexis* clearly leaves open at least one more step in the development of constitutional protection for obscene material. Having created a right of possession, it seems inevitable that the courts will also afford constitutional protection to the supplier. Failure to do so will result in the illogical situation of a newsstand operator, for example, who will be guilty of a crime in every state except New Mexico if he displays, offers, or sells an obscene publication. At the same time, the buyer is not prohibited from buying or possessing the same publication for his own private use. The result is anomalous since the law recognizes a purchaser with a constitutional right to enjoy obscene material, but affords him no legal place to buy it. While the first amendment contains no specific guarantee of a source of literature, it would seem to be a peripheral right without which the right to receive and enjoy would be almost meaningless.

in the per curiam decision of the United States Supreme Court in *Redrup v. New York,* 386 U.S. 767, 18 L. Ed. 2d 515, 87 S. Ct. 1414 (1967), and subsequent cases,[7] which reviewed substantially indentical material and concluded: (1) there is no claim that the applicable statute reflects a specific and limited state concern for juveniles; (2) there is no suggestion of an assault upon individual privacy by publication in a manner so obtrusive as to make it impossible for an unwilling individual to avoid exposure to it; (3) there is no evidence of "pandering" by purveying textual or graphic matter openly advertised to appeal to the erotic interest of customers; (4) the publications are not hardcore pornography and (5) they are not obscene under the prior decisions of the United States Supreme Court which require for a determination of obscenity that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value.

Reversed.

SWANSON, J. (concurring)—I concur in the disposition solely because decisions of the United States Supreme Court virtually dictate a reversal of Cox's decision. This is so because the high court has determined magazines and films indistinguishable from those possessed and exhibited for sale by defendant Cox to be not legally obscene and thus entitled to First Amendment protection. I am, therefore, compelled to yield to a conclusion not in keeping with my own view of the evidence. I would, if permitted, uphold

---

[7]*Potomac News Co. v. United States,* 389 U.S. 47, 19 L. Ed. 2d 46, 88 S. Ct. 233 (1967); *Central Magazines Sales, Ltd. v. United States,* 389 U.S. 50, 19 L. Ed. 2d 49, 88 S. Ct. 235 (1967); *Chance v. California,* 389 U.S. 89, 19 L. Ed. 256, 88 S. Ct. 253 (1967); *Carlos v. New York,* 396 U.S. 119, 24 L. Ed. 2d 303, 90 S. Ct. 395 (1969); *Cain v. Kentucky,* 397 U.S. 319, 25 L. Ed. 2d 334, 90 S. Ct. 1110 (1970); *Hoyt v. Minnesota,* 399 U.S. 524, 26 L. Ed. 2d 782, 90 S. Ct. 2241 (1970).

the trial court's factual determination that Cox's materials are obscene within the meaning of RCW 9.68.010[8] and the United States Supreme Court's definition of obscenity.

*Roth v. United States,* 354 U.S. 476, 1 L. Ed. 2d 1498, 77 S. Ct. 1304 (1957), determined that obscenity is not within the area of constitutionally protected speech or press. But what is "legally obscene" or "obscene in the constitutional sense" is determined by the United States Supreme Court's definition of such terms. To the extent that it has defined them, its definition is controlling upon us. The trial court, in the case at bar, applied the approved test of obscenity given in *Roth,* restated in *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General,* 383 U.S. 413, 16 L. Ed. 2d 1, 86 S. Ct. 975 (1966), and incorporated into *Redrup v. New York,* 386 U.S. 767, 18 L. Ed. 2d 515, 87 S. Ct. 1414 (1967), which requires a coalescence of three elements: (1) the dominant theme when taken as a whole appeals to a prurient interest in sex, (2) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual materials, and (3) the material is utterly without redeeming social value.

Pursuant to the mandate of *Jacobellis v. Ohio,* 378 U.S. 184, 12 L. Ed. 2d 793, 84 S. Ct. 1676 (1964), I have independently examined Cox's magazines and films in a review of the trial court's fact finding. I unhesitatingly brand Cox's materials obscene, not only in the ordinary sense of the word, but also when tested in light of the Roth definition of obscenity. If Cox's materials are not obscene, the word has lost all meaning, and "obscene in the constitutional sense" has succumbed to semantic confusion.

---

[8]RCW 9.68.010, the statute under which Cox was arrested and convicted, is just one of several statutes that could be used to combat obscenity. RCW 7.42.010-.900 provides for injunctions against the sale or distribution of obscene prints and articles. RCW 7.48.120, dealing with nuisances, could be read to include smut shops in certain neighborhoods. Note also that a new statute, RCW 9.68.060, was enacted by the 1969 legislature in extraordinary session, which is specifically aimed at protecting juveniles from obscene materials.

 Notwithstanding such an independent determination of the correctness of the trial court's findings based on an application of the Supreme Court's definition of obscenity, which is obscure at best, the decisive factor is the comparison of the material involved here with those already reviewed and passed upon by our nation's highest court. In *Central Magazines Sales, Ltd. v. United States,* 389 U.S. 50, 19 L. Ed. 2d 49, 88 S. Ct. 235, reversing *sub nom. United States v. Claimant of 392 Copies of a Magazine Entitled "Exclusive,"* 373 F.2d 633 (4th Cir. 1967), involving a federal statute, and *Bloss v. Dykema,* 398 U.S. 278, 26 L. Ed. 2d 230, 90 S. Ct. 1727 (1970), reversing *Dykema v. Bloss,* 17 Mich. App. 318, 169 N.W.2d 367 (1969), and *Hoyt v. Minnesota,* 399 U.S. 524, 26 L. Ed. 2d 782, 90 S. Ct. 2241, reversing *State v. Hoyt,* 286 Minn. 92, 174 N.W.2d 700 (1970), involving state statutes, the Supreme Court reviewed magazines and films identical to those displayed by Cox, focusing on female genitals, and determined such materials to be not obscene in the constitutional sense and thus within the ambit of First Amendment protection. In so doing, the United States Supreme Court found no error in the legal principles involved or in the use of its definition of what is "constitutionally obscene," but, rather, made its own value judgment that the materials involved were not obscene. In the many cases[9] following this procedure, the United States Supreme Court disregarded the findings of other courts, substituted its own subjective value judgment of the materials involved, and assumed the role of a supreme board of censorship for the 50 states.[10] But the United States Supreme Court has spo-

---

[9]For a collection of cases reversed by the United States Supreme Court on the authority of *Redrup,* see *Hoyt,* 286 Minn. at 94.

[10]In *Walker v. Ohio,* 398 U.S. 434, 26 L. Ed. 2d 385, 90 S. Ct. 1884 (1970), Mr. Chief Justice Burger, in dissenting, observed that the trial court tried to apply the standards articulated by the supreme Court in holding that the materials in question are obscene, and said:

.. The Ohio appellate courts declined to disturb that judgment. Yet
. today the Court reverses citing only *Redrup.*

I dissent from such a summary disposition, not only for the reasons expressed in my dissenting opinion in *Cain v. Kentucky,* 397

ken. The message is clear. The conviction must be reversed.

I am, however, unwilling to say, as the majority has in the case at bar, that

> offensive, worthless, prurient material is not to be civilly suppressed or to be the essential element of a criminal conviction unless the material is clearly "hard-core" pornography or unless the accused possessor has conducted himself in a clearly proscribed manner.

(Footnote omitted.) In *Redrup,* the Supreme Court included five different tests for obscenity. Three of the tests concerned the manner in which the material is distributed. The other two were concerned with what kinds of material are obscene in the constitutional sense. One of these latter tests was whether the material was hard-core[11] pornography. The other was the test given in *Roth.* As incorporated into *Redrup,* to meet the Roth test of obscenity, the material must be a coalescence of the three elements applied by the trial court in the case at bar. Because the Supreme Court made a distinction between hard-core pornography and the Roth test, there must be prurient materials which are constitutionally obscene and yet not hard-core.

The majority in the case at bar uses *Stanley v. Georgia,* 394 U.S. 557, 22 L. Ed. 2d 542, 89 S. Ct. 1243 (1969), to buttress its view of what cannot be declared obscene. The United States Supreme Court, in *Stanley,* however, was concerned with the prohibition of the possession of obscene materials, not their distribution. Furthermore, the court distinctly said, *"Roth* and the cases following that decision

> U. S. 319 [90 S. Ct. 1110, 25 L. Ed. 2d 335] (1970), but also because I find no justification, constitutional or otherwise, for this Court's assuming the role of a supreme and unreviewable board of censorship for the 50 States subjectively judging each piece of material brought before it without regard to the findings or conclusions of other courts, state or federal. That is not one of the purposes for which this Court was established.

See Mr. Justice Blackmun's dissenting opinion in *Hoyt* and Mr. Justice Harlan's dissenting opinion in *Bloss.*

[11]See Mr. Justice Stewart's definition of "hard-core" pornography in *Ginzburg v. United States,* 383 U.S. 463, 499 n.3, 16 L. Ed. 2d 31, 86 S. Ct. 942 (1966).

are not impaired by today's holding. As we have said, the States retain broad power to regulate obscenity; . . ." *Stanley,* 394 U.S. at 568.

Yet, even though the Roth standard exists, the Supreme Court as mentioned, has summarily overruled lower-court attempts to apply the Roth standard. Thus, it remains unknown what materials the United States Supreme Court feels are constitutionally obscene under the Roth standard. But whatever it is, it is not protected.

Petition for rehearing denied January 27, 1971.

Review denied by Supreme Court March 2, 1971.