[Nos. 43533, 43534.    En Banc.    February 19, 1976.]

THE STATE OF WASHINGTON, *Respondent*, v. STEVEN ARCHIE HULL, ET AL, *Appellants*.

528

*Victor V. Hoff*, for appellants.

*Christopher T. Bayley, Prosecuting Attorney*, and *Lee D. Yates* and *Thomas H. Wolfendale, Deputies*, for respondent.

WRIGHT, J.—This involves two criminal prosecutions which were certified to this court and have been consolidated under one appeal. The first four issues in both cases are identical and question the constitutionality of RCW 9.68.010. Two additional issues are present in State v. Plumb and will be addressed separately in relation to the facts of that case.

Both appeals assert four constitutional challenges against RCW 9.68.010 pertaining to the publication of obscene materials. First, that statute is challenged on the basis that it is unconstitutionally vague because it does not mention, nor has it been authoritatively construed, to include "sexual" conduct specifically defined by applicable state law, as required by *Miller v. California*, 413 U.S. 15, 37 L. Ed. 2d 419,

93 S. Ct. 2607 (1973). Second, even assuming that the statute was "authoritatively construed" to meet the *Miller* test, the construction in *State v. J-R Distributors, Inc.*, 82 Wn.2d 584, 512 P.2d 1049 (1973), being subsequent to both trials in each appeal, amounts to what appellants term an "ex post facto" application of the law for the reason that the burden of proof in *Miller* is lessened from "utterly without redeeming social value," to "lacks serious literary, artistic, political or scientific value." Third, the instructions based on the now discarded *Roth-Memoirs* test (*Roth v. United States*, 354 U.S. 476, 1 L. Ed. 2d 1498, 77 S. Ct. 1304 (1957); *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General*, 383 U.S. 413, 16 L. Ed. 2d 1, 86 S. Ct. 975 (1966), hereafter *Memoirs v. Massachusetts* or *Memoirs*) are unconstitutionally vague because "patently offensive" was used rather than specific enumerations of conduct and a national rather than local standard was permitted under the *Roth-Memoirs* test. Fourth, RCW 9.68.010 is constitutionally defective because (as construed by *J-R Distributors*) it requires only an awareness of the nature of the contents.

The facts in each case are as follows: In State v. Hull, the appellant was an employee at the Adult Book Store in Seattle, Washington. On March 21, 1972, Detective Henry T. Gruber of the Seattle Police Department entered the store, browsed through the magazines offered for sale, and selected a magazine entitled "Score II." He then took the magazine to the counter and asked the defendant for that magazine by number. The defendant obtained a copy of the magazine from a storage rack behind the counter and asked the detective whether that was the magazine he wished to purchase. The detective replied that he thought so, but asked to see it before purchasing. The particular publication was a pictorial magazine containing photographs without written material of males involved in explicit homosexual activity, including sodomy and fellatio. He thumbed through the pages and at the seventh page of the magazine stopped and pointed at a particular photograph. He said

that was the one he was interested in and showed the photograph to the defendant. The sale was then consummated.

The employee was eventually tried by jury and found guilty of the crime of selling obscene material. He was sentenced to confinement for 90 days, 60 days of which were suspended upon certain conditions, and fined $500. At the trial, the State presented testimony of Dr. Richard B. Jarvis, a psychiatrist who, over the past 5½ years has been canvassing various districts in the Seattle area regarding individual standards of morality. Dr. Jarvis testified over appellant's objection that the magazine "Score II" was obscene by community standards, appealed to a prurient interest in sex, and was utterly without redeeming social value.

In State v. Plumb, appellant was the owner of the Amusement Center Arcade at 1416 First Avenue, Seattle, Washington. On October 17 and 19, 1972, Seattle police detectives went into "panoram booths" at the amusement center. They inserted coins at appropriate intervals which activated the machines, causing motion pictures to be projected onto small screens in the booths. The detectives had a motion picture camera with them which they used to record the images projected. The movies projected in the booths were in color. The detectives recorded the images in black and white. Admission to the amusement center is limited to adults.

The State thereafter used the detectives' photographs as a basis for prosecution against appellant under RCW 9.68.010 for causing obscene motion pictures to be exhibited. Trial was before the court without a jury. The prosecution offered into evidence the motion pictures.

Dr. Jarvis testified that the films appealed to prurient interest and were utterly without any redeeming social value. The trial judge found appellant guilty of two counts of violating RCW 9.68.010 by reason of two different showings of the films.

In both cases (State v. Hull and State v. Plumb), the

triers of fact applied the *Roth-Memoirs* test of obscenity.[1] At the time of both trials, neither *J-R Distributors* nor *Miller* had been decided. Currently, courts in this jurisdiction gauge obscenity issues according to the "authoritative construction" of RCW 9.68.010 in footnote 2 at page 601 in *J-R Distributors*.

As to appellant's first constitutional challenge regarding vagueness of RCW 9.68.010, *Miller v. California, supra* at 24, specifically held in regard to obscenity statutes that "conduct must be specifically defined by the applicable state law, as written or authoritatively construed." Appellant contends that footnote 2 in *J-R Distributors* only incorporates the *Miller* test, without itself designating specific conduct. Therefore, appellant argues, no true narrowing construction exists for RCW 9.68.010. We disagree.

In *J-R Distributors* this court in talking about specific conduct for purposes of *Miller* stated at pages 601-02:

Photographs, pictures and drawings which portray in a patently offensive way sexual conduct such as ultimate sexual acts, normal or perverted, actual or simulated, or which depict acts of masturbation, fellatio, cunnilingus, lewd exhibition of the genitals and sexual relations between humans and animals are "obscene" if, taken as a whole, the subject matter does not have a serious literary, artistic, political, or scientific value.

■■ Of course, we do not intend *J-R Distributors* to be read with the view that the above-enumerated items, or

---

[1]The *Roth-Memoirs* test provides that before material can be deemed obscene, it must be established that (a) the dominant theme of the material taken as a whole appeals to the prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value. *Memoirs v. Massachusetts, supra.*

Contrast this with the *Roth-Miller* test which requires a determination be made whether (a) "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and; (c) the work, taken as a whole, lacks serious "literary, artistic, political, or scientific value." *Miller v. California, supra* at 34.

any of them, when appearing in a publication automatically "criminalizes" the sale of such publication.[2] The *Miller* decision, which was incorporated into *J-R Distributors* by footnote 2, safeguards against overbreadth by requiring that the conduct contain a depiction or description, that is patently offensive by local standards, appeals to prurient interest, and lacks serious literary, artistic, political or scientific value. Our authoritative construction of RCW 9.68.010 in *J-R Distributors* meets the *Miller* conduct description requirements.

Secondly, appellant contends that he is immune from prosecution for two reasons: (1) that *Miller* cannot constitutionally be applied retroactively and, (2) that RCW 9.68.010 and the *Roth-Memoirs* instruction were unconstitutionally vague.

It is true that at the time of prosecution in both appeals, the *Miller* test was nonexistent and *J-R Distributors* had secured no narrowing construction to the word "obscene" in RCW 9.68.010. In both cases, the *Roth-Memoirs* test was the guideline for the trier of fact. Appellant contends that the *Roth-Miller* test is the only current constitutionally permissible standard for judging obscenity prosecution appeals. Appellant further asserts that the only alternative for this court is to remand these cases for retrial under the new *Roth-Miller* test, which is not constitutionally permissible for three reasons: First, the *Miller* test was nonexistent at the time of sale and therefore that test is incapable of giving notice of what constituted impermissible depicions or descriptions of sexual conduct. Second, the substitution of "lacks serious literary, artistic, political or scientific value" (*Miller* at the time of appeal) for "utterly without redeeming social value" (*Memoirs* at the time of sale) amounts to a retroactive lessening of the burden of proof. Third, the excising of a national community in *Mem-*

---

[2]For example, the national best seller, *The Joy of Sex* is not unlawful merely because it contains sexually frank material. *See also Jenkins v. Georgia*, 418 U.S. 153, 41 L. Ed. 2d 642, 94 S. Ct. 2750 (1974), which held that explicit depictions of sexual congress, are not enough, alone, to make the material obscene under the *Miller* standards.

*oirs* and the replacement with a statewide or local standard in *Miller*, amounts to a surprise construction of the word "obscene" as in RCW 9.68.010, which violates due process if used in this appeal.

As a first proposition, we note that the cases are split as to whether *Miller* may be applied retroactively or not. In *State ex rel. Chobot v. Circuit Court*, 61 Wis. 2d 354, 212 N.W.2d 690 (1973), the court said at pages 371-72:

> The question thus is whether the foregoing construction was so unforeseeable as to preclude its retroactive application to punish conduct occurring prior to the rendition of this construction.
>
> Some trial courts in decisions rendered subsequent to *Miller* have discussed the retroactivity issue without deciding it. . . .
>
> However, in our view, *Miller* has not made such drastic changes in the law of obscenity that the now *Roth-Memoirs-Miller* test needs to be specifically brought to the attention of all persons before it can be said that the notice comports with due process. The changes and modifications wrought by *Miller* are not so substantial in view of this court's prior interpretations of the statute that due process requires that a defendant be given notice of the latest modifications. Nor are the changes so serious as to mislead one intent on obeying the law.

(Citations omitted.) *Accord, Madison v. Nickel*, 66 Wis. 2d 71, 223 N.W.2d 865 (1974).

In *State v. Timmons*, 12 Wn. App. 48, 52-53, 527 P.2d 1399 (1974), a contrary result was reached. However, *Timmons* is clearly distinguishable: [3]

> We hold that Timmons was denied due process when the jury was instructed on the basis of the *Miller* and *J-R Distributors* test of obscenity. A fundamental concept of due process is that citizens are entitled to fair warning that particular conduct is proscribed before they can be held criminally liable for engaging in it. *United States v. Harriss*, 347 U.S. 612, 98 L. Ed. 989, 74 S. Ct. 808 (1954).

---

[3]*State v. Timmons, supra*, expressly held that *Miller*, or any case incorporating the *Miller* test, could not be applied retroactively. In *Timmons*, trial was pending at the time that RCW 9.68.010 was authoritatively construed in conformity with *Miller*.

This principle is the basis for the prohibition of ex post facto, overbroad and vague legislation. It will also operate to protect individuals from some retroactive applications of judicial constructions. *Bouie v. Columbia*, 378 U.S. 347, 12 L. Ed. 2d 894, 84 S. Ct. 1697 (1964). . . .

. . . The *Miller* case was "unexpected"—Timmons cannot be charged with anticipating the creation of a new obscenity test. Furthermore, the new test is not a mere revision of the old. The requirement that the work as a whole be without "serious literary, artistic, political, or scientific value" will bring into the ambit of obscenity many materials protected under the "utterly without redeeming social value" rule, which was the test of obscenity incorporated into RCW 9.68.010 by our courts when the films in question were sold.

*Accord, United States v. Lang*, 361 F. Supp. 380 (C.D. Cal. 1973).

In *Lang* it was stated at page 382:

The newly formulated *Miller* test eases the prosecution's burden, and enhances the likelihood of successful prosecution. The new test simply requires that the prosecution show, *inter alia*, that "the work, taken as a whole, lacks *serious* literary, artistic, political, or scientific value." *Miller, supra*, ........... U.S. at ..........., 93 S.Ct. at 2615 (emphasis added). In short, the Court's new test substantially changes the law of obscenity, and as a general proposition now makes it easier to convict the defendants. Therefore, to prosecute defendants under the judicially devised *Miller* definition of obscenity and to instruct the jury on it would, without fig leaves, be the functional equivalent of an *ex post facto* application of the law. This the due process clause forbids. Bouie v. City of Columbia, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). Moreover, to apply retroactively the judicial construction now placed on § 1461 would further deprive defendants of due process by having denied them fair warning that their acts, when committed, constituted a crime.

To state the matter briefly, the appellants benefit by the *Memoirs* test. The State will have more difficulty in proving a work is "utterly without . . . value" than in

proving it "lacks serious . . . value." This line of approach was taken in at least two cases, *United States v. Gower*, 503 F.2d 189 (D.C. Cir. 1974) and *Roberts v. Gates*, 24 Md. App. 374, 330 A.2d 705 (1975). One thing is certain, retroactive application of *Miller* is not necessarily required.[4] In *Jenkins v. Georgia*, 418 U.S. 153, 41 L. Ed. 2d 642, 94 S. Ct. 2750 (1974), the court stated at page 155:

> We hold today in *Hamling* v. *United States, ante*, p. 87 [418 U.S. 87, 41 L. Ed 2d 590, 94 S. Ct. 2887 (1974)], that defendants convicted prior to the announcement of our *Miller* decisions but whose convictions were on direct appeal at that time *should receive any benefit available* to them from those decisions.

(Italics ours.)

■■ Both appellants' publications are clearly of the "hard core" variety and are clearly within the two examples cited by *Miller*.[5]

The only task remaining now is to determine whether appellants were denied due process in the two trials conducted prior to the authoritative construction of RCW 9.68.010 in *J-R Distributors*. Prior to *J-R Distributors*, the word "obscene" in RCW 9.68.010 had been given a de facto narrowing construction. The legislature omitted to define

---

[4]The court in *Miller* remanded *Miller v. California, supra* at 37, for "proceedings not inconsistent with . . . this opinion" thereby permitting a state to narrow its obscenity statutes without necessarily offending constitutional prohibitions of ex post facto application of law. As was later held in *Hamling v. United States*, 418 U.S. 87, 41 L. Ed. 2d 590, 94 S. Ct. 2887 (1974) and *Jenkins v. Georgia*, 418 U.S. 153, 41 L. Ed. 2d 642, 94 S. Ct. 2750 (1974), the defendant, on appeal, is entitled to the *benefit* of the *Miller* requirement that the conduct be specifically prohibited by applicable state law. This was the purpose of the above-quoted language. The *Miller* court did not say that a remand and trial with a *Miller* instruction was constitutionally required and we find no language implying this.

[5]The *Miller* court stated at page 25: "It is possible, however, to give a few plain examples of what a state statute could define for regulation under part (b) of the standard announced in this opinion, *supra*:

"(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.

"(b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals."

that term and our courts simply applied whatever definition the United States Supreme Court supplied from time to time. *State v. Timmons, supra; State v. Cox,* 3 Wn. App. 700, 477 P.2d 198 (1970); *Grove Press, Inc. v. Brockett,* 312 F. Supp. 496 (E.D. Wash. 1970). At the occurrence of the alleged criminal acts, and at the trials, the word "obscene" as in RCW 9.68.010 was limited by the *Roth-Memoirs* test, then in effect. *State v. Timmons, supra.* This test, in the time span that it existed, was constitutionally sufficient for purposes of giving notice of proscribed conduct and is not constitutionally vague for purposes of this appeal. *B & A Co. v. State,* 24 Md. App. 367, 330 A.2d 701 (1974); *United States v. Gower, supra; Hamling v. United States,* 418 U.S. 87, 41 L. Ed. 2d 590, 94 S. Ct. 2887 (1974).

It must be remembered that *Miller* did not render unconstitutional all pre-*Miller* statutes or case law omitting designations of specific conduct. As was stated in *Hamling v. United States* at page 116:

> But the enumeration of specific categories of material in *Miller* which might be found obscene did not purport to make criminal, for the purpose of 18 U. S. C. § 1461, conduct which had not previously been thought criminal. That requirement instead added a "clarifying gloss" to the prior construction and therefore made the meaning of the federal statute involved here "more definite" in its application to federal obscenity prosecutions.

Merely because a pre-*Miller* statute omits specific conduct does not mean that the statute is unconstitutionally vague. This problem was addressed in *Hamling* at page 110 where the court answered just such a challenge by petitioners in that case:

> Petitioners next argue that prior to our decision in *Miller,* 18 U. S. C. § 1461 did not contain in its language, nor had it been construed to apply to, the specific types of sexual conduct referred to in *Miller,* and therefore the section was unconstitutionally vague as applied to them in the prosecution of these cases. Such an argument, however, not only neglects this Court's decisions prior to *Miller* rejecting vagueness challenges to the federal stat-

ute, but also fundamentally misconceives the thrust of our decision in the *Miller* cases.

And at pages 112-13 the court continued:

At no point does *Miller* or any of the other obscenity decisions decided last Term intimate that the constitutionality of pre-*Miller* convictions under statutes such as 18 U. S. C. § 1461 was to be cast in doubt. Indeed, the contrary is readily apparent from the opinions in those cases. We made clear in *Miller*, 413 U. S., at 24 n. 6, that our decision was not intended to hold all state statutes inadequate, and we clearly recognized that existing statutes "as construed heretofore or hereafter, may well be adequate."

In *B & A Co. v. State, supra,* appellants sold "obscene" material at a time when the Maryland statute had not been given a *Miller*-type narrowing construction. The statute did not define the word "obscene," but, nevertheless, the court sustained its validity by affirming conviction. The court in *B & A Co.* held that the *Roth-Memoirs* test, adopted as part of the decisional law of that state, was sufficient to delineate proscribed depictions. The court stated at pages 370-71:

We conclude that the *Miller* court did not invalidate preexisting obscenity standards; on the contrary, it superimposed a test which lessens the prosecutor's evidentiary burden and thus will in all likelihood result in the expansion of obscenity restrictions. . . .

. . . we conclude the *Miller* court did not hold preexisting obscenity law violative of first amendment . . .

In enacting its obscenity law, Maryland chose not to define "obscene" but to permit courts to apply whatever definition the Supreme Court supplied from time to time, using the term, however, to describe that which is proscribed. . . . that the use of that term gives adequate warning of the forbidden conduct and marks boundaries sufficiently distinct for judges and juries fairly to administer the law. While a more specific statutory definition may have been preferred by the *Miller* Court, it was not mandated.

*Accord, United States v. Gower, supra.*

To reiterate, the real purpose of the *Miller* test is to deal,

not so much with "hard core" pornography, as it is to deal with the more troublesome cases in which highly prurient and offensive elements are found mixed with some elements of intellectual or literary purpose. In the case of "hard core" publications, pre-*Miller* statutes (with United States Supreme Court case limitations) have generally been upheld so long as there were "boundaries sufficiently distinct for judges and juries fairly to administer the law." *Roth v. United States*, 354 U.S. 476, 1 L. Ed. 2d 1498, 77 S. Ct. 1304 (1957). In other words, the character of a publication will determine whether or not the pre-*J-R Distributors'* version of RCW 9.68.010 is constitutionally deficient.[6]

In view of the admitted "hard core" nature of the publications, we do not think that appellants were caught by surprise by thinking their publications were not obscene—they were admittedly obscene. The problems of "vagueness," "fair warning," and "chilled distribution" are simply not in issue in regard to the contents of these two publications.[7] Therefore, we hold that the failure to enu-

---

[6]An example of how the specific publication determines the constitutionality of the statute is found in *Hamling v. United States, supra* at 115. In *Hamling*, the court sustained a conviction under a pre-*Miller* statute (18 U.S.C. 1461) which at the time of conviction had been "narrowed" by the *Roth-Memoirs* test. The court stated at pages 115-16:

It is plain from the Court of Appeals' description of the brochure involved here that it is a form of hard-core pornography well within the types of permissibly proscribed depictions described in *Miller*, and which we now hold § 1461 to cover. Whatever complaint the distributor of material which presented a more difficult question of obscenity *vel non* might have as to the lack of a previous limiting construction of 18 U. S. C. § 1461, these petitioners have none. See *Dennis* v. *United States*, 341 U. S. 494, 511-515 (1951) (opinion of Vinson, C. J.).

. . . Judged by both the judicial construction of § 1461 prior to *Miller*, and by the construction of that section which we adopt today in the light of *Miller*, petitioners' claims of vagueness and lack of fair notice as to the proscription of the material which they were distributing must fail.

[7]The problems of "vagueness," "lack of fair notice," and "chill on protected expression" are problems whose magnitude is susceptible to exaggeration. As pointed out in Clor, *Obscenity and the First*

merate specific conduct in RCW 9.68.010 did not render that statute unconstitutionally vague, particularly in that the trier of fact, in both instances, applied the *Roth-Memoirs* test.

■ The remaining consideration is whether the *Memoirs* "national" standard so differs from *Miller*'s "statewide or local" standard, as to require reversal. In *Hamling v. United States, supra,* this issue was considered at page 104:

> *Miller* rejected the view that the First and Fourteenth Amendments require that the proscription of obscenity be based on uniform nationwide standards of what is obscene, describing such standards as "hypothetical and unascertainable," 413 U. S., at 31. But in so doing the Court did not require as a constitutional matter the substitution of some smaller geographical area into the same sort of formula; . . .

At page 108, the court further held:

> [W]e hold that reversal [in pre-*Miller* cases] is required only where there is a probability that the excision of the

*Amendment: Round Three,* 7 Loyola of Los Angeles L. Rev. 207, 212-13 (1974):

> It does not require the deployment of very sophisticated aesthetic criteria to determine that pornographic "action" films, live sex shows, sado-masochistic novelettes, and the pictorial magazines featured in "adult book shops" are lacking in the qualities that characterize genuine literature and art. It does not require a literary critic to distinguish the crude scenario of the standard pornographic novellette from the carefully constructed plot and subtle characterization of *Lady Chatterley's Lover.* . . .
>
> . . . What criteria are we tacitly employing when we say, with reasonable confidence, that *Lady Chatterley's Lover* is a serious literary work and *Lust for Sale* is not? The former presents human personalities struggling with a vital human and moral problem. Its intention is to confront the reader—emotionally and intellectually— with that problem and not to arouse sexual desires as such. The latter presents no human personalities at all; its "characters" are reduced to mere objects of sensual gratification. The intention is simply to arouse depersonalized sexual passion (which is the proper definition of the word "lust"), and the "plot" is stereotyped to that end. Much more could be said along these lines. The point is that it is not impossible to articulate, with a measure of clarity, the standards by which we distinguish the aesthetic experience promoted by works of art from the mere stimulation of elemental sensuality which is the work of pornography.

references to the "nation as a whole" in the instruction dealing with community standards would have materially affected the deliberations of the jury. . . . Our examination of the record convinces us that such a probability does not exist in this case.

■ In the instant appeals, the triers of fact received testimony from Dr. Jarvis, who had made a 5½-year study on the moral attitudes of Seattle city residents pertaining to sexually frank material. Expert testimony is not required in obscenity convictions, but neither is such testimony reversible error. *Hamling v. United States, supra;* McGaffey, *A Realistic Look at Expert Witnesses in Obscenity Cases,* 69 Nw. U.L. Rev. 218 (1974). There is no error in regard to this evidence.

■ The fourth and final constitutional attack on RCW 9.68.010 consists of appellants' assertion that *J-R Distributors* requires only an awareness of the nature of the contents, without actual scienter, thereby rendering that statute unconstitutional as construed. It is true that an obscenity enactment cannot constitutionally eliminate altogether a scienter requirement. *Smith v. California,* 361 U.S. 147, 4 L. Ed. 2d 205, 80 S. Ct. 215 (1959). However, *J-R Distributors* does not purport to stand for appellants' proposition, but merely states that the trier of fact may infer knowledge of content by the circumstances attending the sale. Proof of actual perusal of the material by the defendant is not required. *Smith v. California, supra.*

We will analyze both appeals in this light in order to determine whether the circumstances of the sales presented the triers of fact with sufficient evidence to infer knowledge.

■ State v. Hull: In this case, the cashier saw not only the cover of the publication, but was specifically shown page seven of the publication immediately preceding the sale. From this, the jury could have inferred that defendant knew that the publication could justly be characterized as obscene.

In *Madison v. Nickel,* 66 Wis. 2d 71, 223 N.W.2d 865

(1974), the court held that a jury, in certain instances, could infer that a sales clerk had knowledge of the contents of a publication merely by viewing the cover while ringing up the sale, depending on the nature of the cover.[8] In this case, both the cover and page seven of "Score II" portrayed males who were engaged in specific homosexual congress. We conclude that the jury's finding of "knowledge" was supported by the evidence.[9]

State v. Plumb: In this appeal, appellant insisted that he had never viewed either of the two films in question. On cross-examination, the appellant's testimony established the following facts upon which the trial court based its decision: Appellant testified he had been connected with the Amusement Center Arcade for nearly a year prior to his purchasing the majority interest in the center. He managed the operations in the center and as a joint effort with the projectionist, once a week metered the machines and emptied the coin boxes. Appellant testified that it was the duty of the projectionist to purchase the films and change the films on the machines. The projectionist and the appellant checked the meters on the machines to indicate which ones were doing well and which ones were not. When the play on a specific machine dropped, the projectionist would change the film. Appellant stated that over the 8-year period that the projectionist had been employed by the corporation, he (the projectionist) had acquired a capacity to discern and select those films that would be most popular to

---

[8]The court in *Nickel* stated at page 83: "The unrefuted testimony of Officer Tuttle was that after selecting the magazines he 'observed Mrs. Nickel pick up the magazines' and 'add up the price. . . .' an inescapable inference is that in so doing the defendant looked at the cover of the magazines, the portrayals on which certainly give indication as to the nature of the contents. If the defendant did not have actual knowledge of the contents of the magazines at this point, she clearly had 'ground[s] for belief which warrant[ed] further inspection or inquiry of the character and content' of the magazines. *See Court v. State* (1971), 51 Wis.2d 683, 689, 188 N. W. 2d 475."

[9]*See Rosen v. United States*, 161 U.S. 29, 40 L. Ed. 606, 16 S. Ct. 434 (1896); *United States v. Thevis*, 484 F.2d 1149 (5th Cir. 1973); *Hamling v. United States*, 418 U.S. 87, 41 L. Ed. 2d 590, 94 S. Ct. 2887 (1974).

the amusement center's clientele. For this reason, appellant asserts he delegated the job of buying, handling and changing the reels on the panorams to the projectionist. Appellant admitted that he had viewed some of the films on occasion and knew that his machines ran films of the "hard core" or "tough" variety. He stated he had limited dealings with suppliers and left the details of selection and purchasing to the projectionist. Appellant was on the premises the day of projection of these films and admits that during the week preceding the detectives' surveillance and recording activities, he had probably jointly "serviced" the panorams containing the two challenged reels, although he does not specifically remember so doing.

■ These facts are capable of supporting the finding that on each occasion, appellant, at the very least, aided and abetted the exhibition of the films and that he did so with knowledge of facts which would put a reasonable and prudent man on notice of the nature of the material. Under RCW 9.01.010 and 9.01.030, this would make him liable as a principal. The appellant's self-serving statement that he had never actually "seen" the two reels raises an issue of credibility. Such testimony could be weighed and disregarded by the trier of fact altogether. Appellant's admission that he routinely "serviced" the machines with the "projectionist," and that he managed and owned the amusement center, provided adequate evidence upon which the trier of fact could conclude that appellant knew of the content of the two films. Accordingly, we hold that there are sufficient facts in both appeals for the trier of fact to have concluded that appellants had the required scienter.

The two remaining issues pertain to State v. Plumb only: First, whether the appellant can be said to have caused to be exhibited an obscene film, and, second whether the reprint of the film was legally sufficient to support the conviction.

■ In answer to the first issue, appellant contends that the mechanism projecting the image could only be activated by insertion of coins and that on both occasions,

the defendant in no manner activated these projections. Appellant asserts that causation exists exclusively in the act of the patrons. We disagree. The words "cause to be . . . exhibited" in RCW 9.68.010 are plain and admit no more than one meaning. This court's duty is to construe legislation so as to make it purposeful and effective. *Krystad v. Lau*, 65 Wn.2d 827, 400 P.2d 72 (1965); *O'Connell v. Conte*, 76 Wn.2d 280, 456 P.2d 317 (1969); *Foster v. Knutson*, 84 Wn.2d 538, 527 P.2d 1108 (1974); *Schwarz v. State*, 85 Wn.2d 171, 531 P.2d 1280 (1975); *Baker v. Morris*, 84 Wn.2d 804, 529 P.2d 1091 (1974); *Mason v. Bitton*, 85 Wn.2d 321, 534 P.2d 1360 (1975). We cannot limit the word "cause" in RCW 9.68.010 to appellant's version. When a patron enters the amusement center he comes onto a set stage. The panoram machines are serviced by appellant and are waiting to be activated. The realities of the situation present a commercial transaction in which appellant causes an exhibition in exchange for money. The trial judge in his memorandum of decision aptly describes the true purpose of the panoram machines in appellant's operations:

> The setting up of a coin machine for the public and the showing that coins are either put in or the film was taken out in a business premises is causing it to be exhibited. This is the means of making the sale in the business world. A coin machine that vends candy bars, someone puts a dime in to get his candy bar. That is certainly causing a candy bar to be delivered to the customer. They set the machine up and had it ready to trip with a coin that caused the exhibition.

*See also State v. J-R Distributors, Inc.*, 82 Wn.2d 584, 512 P.2d 1049 (1973). After carefully considering appellant's assertions concerning this issue we cannot agree therewith.

The problem of admitting copies of an original film into evidence has been discussed thoroughly in *J-R Distributors* at pages 639-41. Basically, the problem of film reproduction in obscenity cases is one of credibility and weight to be given the reprint, rather than being a problem of admissiblity. The trier of fact may simply believe that the item of evidence does not represent a true copy of the

publication and rule accordingly. *Bryers v. State*, 480 S.W.2d 712 (Tex. Crim. 1972). In the instant case, the State laid a proper foundation for admission. Nearly 30 pages of trial transcript contain Detective Gruber's testimony in connection with the manner of preparation of the copy, the kind of camera used, film size, shooting speed, lighting, booth configuration, accuracy of the reproduction, etc. The trial court committed no error in admitting the copies.

We, therefore, conclude that RCW 9.68.010, as presently construed in *J-R Distributors*, is constitutional; that RCW 9.68.010, as applied at the time of these two trials, was constitutionally valid; that there was sufficient evidence to show "scienter" in both appeals; that there was legal causation in relation to appellant's acts in State v. Plumb; and that the State's reproduction of the panoram reels were admissible into evidence.

The convictions in both appeals are affirmed.

STAFFORD, C.J., and FINLEY, ROSELLINI, HUNTER, HAMILTON, UTTER, BRACHTENBACH, and HOROWITZ, JJ., concur.

Petition for rehearing denied May 27, 1976.